IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

NADLEY ROMEO,

    Plaintiff,

       v.                              CIVIL NO.: WDQ-11-2208

APS HEALTHCARE BETHESDA, INC.,

    Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Nadley Romeo sued APS Healthcare Bethesda, Inc. ("APS") for
employment discrimination, in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII").[1]  For the following
reasons, the Court will grant APS's motion to dismiss and for
summary judgment.

I. Background[2]

APS is a health care management company whose clients
include Medicaid programs, health plans, and state and local
governments.  ECF No. 11, Ex. 5 at 6.  Romeo is an African

_____

[1] 42 U.S.C. §§ 2000e, *et seq.*

[2] For APS's motion to dismiss, the well-pled allegations in
Romeo's complaint are accepted as true.  *See Brockington v.
Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011).  For the motion
for summary judgment, Romeo's evidence "is to be believed, and
all justifiable inferences are to be drawn in [her] favor."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

American woman.  Am. Compl. ¶ 3.  On October 15, 2007, APS hired
Romeo as an accounts receivable revenue supervisor at an annual
salary of $55,000.[3]

On February 29, 2008, a performance evaluation found that
Romeo was "meet[ing] expectations."  ECF No. 13, Ex. B.  Her
supervisor, Bernard Wrisk, said that Romeo was "competent" at
managing her workload, timely completing projects, and building
customer confidence, and "above average" at working with others.
*Id.* at 2-5.  Her overall performance was rated 3 out of 5.  *Id.*
at 6.

On March 10, 2008, Romeo's job title was changed to
Accountant III.  ECF No. 13, Ex. C.  Her salary remained the
same.[4]  On April 3, 2008, Brian Cuomo became Romeo's supervisor.
ECF No. 13 at 2; ECF No. 11, Ex. 8.  On April 29, 2008, APS
hired Jason Bishop, a white man, as Accountant III at an annual
salary of $65,000.[5]

---

[3] Am. Compl. ¶ 6; ECF No. 13, Ex. A.  APS submitted evidence that
Romeo had about five years of experience, including work as a
staff accountant and billing supervisor, and a temporary
assignment in "corrections/billing."  ECF No. 11, Ex. 1.  Romeo
has a bachelor's degree in psychology from New York University,
and was taking accounting classes at the University of Maryland,
College Park.  *Id.*

[4] ECF No. 11-1 at 3; ECF No. 13 at 2.  APS asserts that the
change was "consistent with internal reorganization."  ECF No.
11-1 at 6.

[5] ECF No. 13, Ex. D; ECF No. 11-1 at 5.  APS submitted evidence
that Bishop had about eight years of experience working as a

On July 22, 2008, Romeo's mid-year performance evaluation said that she was "meet[ing] expectations" but "need[ed] improvement" in communication, "look[ing] for, recommend[ing], and act[ing] on opportunities to improve business results," and "solv[ing] problems creatively." ECF No. 13, Ex. E at 3-4, 6. Cuomo rated Romeo "competent" at decision making, prioritizing, "meet[ing] commitments," and working independently. *Id.* at 2-4. He said that he expected "more intuitive decision making," "a greater understanding of what is being billed, recognized, and unearned," "a partnership with fellow associates and not the blame game," "more time planning and organizing . . . thoughts before . . . present[ing] them to others," and "more initiative in solving problems on her own." *Id.* at 2-4. He noted that Romeo "perform[ed] well under normal circumstances but ha[d] some difficulty handling new developments without assistance." *Id.* at 4. Cuomo said that he wanted Romeo to "complete [the] reconciliation/overhaul" of certain accounts "to identify the true account numbers involved" and "prevent discrepancies from occurring again." *Id.* at 1. Romeo's overall performance was rated 3 out of 5. *Id.* at 6.

In late 2008 or early 2009, Cuomo evaluated Romeo's

lead accountant, billing manager, and account manager. ECF No. 11, Ex. 9 at 11. He has a master's degree in business administration from Radford University, and a bachelor's degree in business administration from Roanoke College. *Id.* at 5.

performance again and determined that she was "meet[ing] expectations, was "competent" at decision making, prioritizing, taking initiative, and communication, and was "above average" in dependability.  ECF No. 13, Ex. F at 4-6.  Cuomo noted that Romeo "continue[d] to bill both accurately and timely," "deal[t] with problems and opportunities as they ar[o]se," and was "respectful and attentive."  *Id.* at 2-5.  He said that he expected Romeo to "take a more active role in understanding the components making up public contracts," "maintain[ing] spreadsheets analyzing trends," and "understanding revenue and month over month variances."  *Id.* at 3-5.  He said that he wanted Romeo to continue the "reconciliation/overhaul" of certain accounts to "prevent discrepancies from occurring again," and expected Romeo to "enhance her understanding of the business," "explain business variances," "identify missed revenue opportunities," and "spend a little more time planning and organizing her thoughts before she presents them to others."  *Id.* at 2, 5-6.  Romeo's overall performance was rated 3 out of 5.  *Id.* at 6.

On February 27, 2009, Romeo emailed human resources director Ahlai Wojcik about the "need to speak to someone in HR on a huge issue."  ECF No. 13, Ex. G.  On March 4, 2009, Romeo faxed Wojcik a complaint about her "disagreement with [her] current change of roles" and "year of torment" under Cuomo's

4

supervision.  ECF No. 13, Ex. H at 1-2.  Romeo said that she had been forced out of the department so that Bishop could take her original job at a higher salary.  *Id.* at 2.  She accused Cuomo of having "strong animosity towards [her]," possibly because she "[is] a woman or because [she] [is] a black woman."[6]  She said that Cuomo "deliberately ma[de] [her] feel like [she] [didn't] exist," and "ma[de] it painfully clear every single day that he [didn't] like [her] and perhaps the sight of [her] disgust[ed] him."  *Id.* at 2-3.  She complained that he would not "speak to [her] on a daily basis unless a crisis ar[ose]," looked at her with "a scowl," "attack[ed]" her verbally in "harsh tones," and forbade her from "speak[ing] and laugh[ing] with others in the office."  *Id.* at 1-4.

Romeo's fax also noted that her "last review" had been "good on paper," but the "face to face [had been] horrible." ECF No. 13, Ex. H at 6.  Cuomo had told her that she was "the only one who [felt] overwhelmed in the department and not open

---

[6] ECF No. 13, Ex. H at at 3.  APS submitted two copies of the letter: the version Romeo provided, *see* Mem. in Supp. of Mot. to Dismiss, Ex. 20, and a version in which Romeo made no mention of her race or gender, *see* Reply, ECF No. 15, Attach. 2 (APS Exhibit 27).  APS asserts that the latter version was the one "originally sent to human resources, and included by [Romeo] in her initial [Equal Employment Opportunity Commission] filing." ECF No. 15 at 5 n.3.  Because APS provided both versions--and Romeo's evidence "is to be believed," *see Anderson*, 477 U.S. at 255--the Court will accept as true the version of the letter supplied by Romeo.

to take on more work," "[e]xecutives need[ed] all these analytics and [she] [was] not delivering," and "he [was] now forced to jump in and do [her] job." *Id.* at 4-6. Romeo said that she had been "shocked" during her review when Cuomo said that the "CFO, Controller, [and] VP need[ed] requests and [she] [had not] produc[ed] them." *Id.* at 5. She said that Cuomo had told her that managers and co-workers had complained about her performance, but when she approached these people, all had denied having complained. *Id.* at 5.

On April 23, 2009, Romeo was fired.[7]

_____

[7] Am. Compl. ¶ 16; ECF No. 11, Ex. 22. APS submitted a copy of Romeo's termination letter, in which Cuomo asserted that Romeo had shown only "minimal improvement" in her communication skills and had begun 2009 "with the same tendencies addressed" in her 2008 review, "consistently looked to others to provide answers to business questions," and had overstated revenue, taken almost four weeks to accomplish a project that should have taken three days, and written off an outstanding balance on April 21, 2009, contrary to his instructions. ECF No. 11, Ex. 21 at 1-3. Cuomo also asserted that other employees, "[o]n many occasions," had "question[ed] [Romeo's] knowledge and accounting skills." *Id.* at 1.

APS also submitted emails that allegedly showed Romeo's incompetence. *See* ECF No. 11, Ex. 17, 19. In a series of emails from September 2008 through January 2009, Cuomo asked Romeo why an account had been "short paid," and "where missing cash [was] being booked." ECF No. 11, Ex. 17 at 4, 6, 12. On February 10, 2009, Cuomo emailed Romeo to ask why the company had not collected payments from a client for five months. *Id.* at 13. In an April 9, 2009, email Romeo told an APS official to expect a "forthcoming" explanation of "why accruals [had been] overstated." ECF No. 11, Ex. 19 at 2.

On April 20, 2009, Cuomo asked Romeo to "explain in writing the reason for [a] $1041 short payment." ECF No. 11, Ex. 19 at

On July 13, 2009, Romeo filed a complaint with the Maryland
Commission on Human Relations and the Equal Employment
Opportunity Commission (the "EEOC"), alleging race and sex
discrimination and retaliation, in violation of Title VII and
the Equal Pay Act of 1963 (the "EPA").[8]  Am. Compl. ¶ 19, Ex. G
(Discrimination Charge).  She alleged that she had been moved to
a new position without explanation, a "non-black male" had
filled her former job, and he had received more pay than she
had.  Discrimination Charge.  She further asserted that she had
been fired after complaining about "harassment and hostile work
environment."  *Id.*

On May 12, 2011, the EEOC issued Romeo a right-to-sue
notice.  Am. Compl., Ex. H.  On August 9, 2011, she sued,
alleging race and gender discrimination, retaliation, and
negligent infliction of emotional distress.[9]  She asserted that:

- Cuomo had "yell[ed] at [her], curse[d] at [her][,] and
  ma[d]e disparaging comments towards [her]."  Am. Compl. ¶
  12.

---

8.  Romeo responded that there had been several "invoice
revisions for that contract," a $31,000 balance had been
"created in error," and the balance "need[ed] to be written
off."  *Id.*  Cuomo told Romeo to "do nothing with the balance"
until he had discussed it with someone else.  *Id.*

[8] 29 U.S.C. § 206(d).

[9] On September 12, 2011, Romeo filed an amended complaint with
the same claims.  ECF No. 3.

- In her presence, Cuomo had said that, "now that we have a black president[,] the country is going down," an African American employee could "[n]ever be found because he and his wife [were] at an all you can eat [restaurant]," another African American employee had been late one day because she had been "at an all you can eat [restaurant] stuffing her face or probably somewhere getting her cholesterol checked," and a third African American employee's waistline was attributable to HIV/AIDS.  Am. Compl., Ex. I at 3.

- Romeo had been "subjected to tasks which were not expected of her male counterparts."  Cuomo had once asked her to "lift heavy boxes as her male, Caucasian" co-workers "looked on and ridiculed her."  Am. Compl. ¶ 36.

- Wojcik had sent Romeo's complaint to Cuomo, and Cuomo's yelling and cursing had "worsened."  Am. Compl. ¶¶ 11-12, Ex. C.

- Unlike her Caucasian co-workers, Romeo had been given no warning before her termination.  Am. Compl. ¶ 18.

On November 22, 2011, APS moved to dismiss or for summary judgment.[10]  On December 9, 2011, Romeo opposed the motion.  ECF

---

[10] ECF No. 11.  The motion was timely.  *See* ECF No. 12 (order granting APS until November 22, 2011, to file a responsive pleading).

No. 13.  On December 30, 2011, APS filed a reply.[11]

## II. Analysis

APS argues that the Court should dismiss Romeo's claim for negligent infliction of emotional distress because it is not recognized in Maryland law.  ECF No. 11-1 at 8-14.  APS also argues that it is entitled to summary judgment on Romeo's retaliation and discrimination claims because she has not presented a prima facie case or rebutted APS's lawful reasons for firing her.  *Id.* at 8-15.

### A. Standards of Review

#### 1. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001).  Although Rule 8's

---

[11] ECF No. 15.  The reply was timely.  *See* ECF No. 16 (order granting APS until December 30, 2011, to file a reply).

notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[ ] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 679. "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown-- that the pleader is entitled to relief." *Id.* (internal quotation marks omitted).

2. Summary Judgment

Under Fed. R. Civ. P. 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for summary judgment, "the judge's function is not . . . to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant," and draw all reasonable inferences in her favor, *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

B. APS's motion

APS moved to dismiss Romeo's negligent infliction of emotional distress claim, and seeks summary judgment on the retaliation and discrimination claims.

1. Negligent Infliction of Emotional Distress

APS argues that "Maryland does not recognize an independent tort of negligent infliction of emotional distress." ECF No. 11-1 at 8. Romeo concedes this, but argues that Maryland allows "recovery of emotional distress damages as a result of a recognized tort such as negligence." ECF No. 13 at 6-7

11

(internal citation omitted).  She contends that her claim should not be dismissed because it asserts "emotional distress damages resulting from a negligent act."  *Id.* at 8.

The Court must dismiss Romeo's claim for negligent infliction of emotional distress.  Although "[r]ecovery may be had in a tort action for emotional distress arising out of negligent conduct . . . . , the emotional distress is an element of damage, not an independent tort."  *Hamilton v. Ford Motor Credit Co.*, 502 A.2d 1057, 1066 (Md. Ct. Spec. App. 1986).  Maryland does not recognize the tort of negligent infliction of emotional distress.  *See Lapides v. Trabbic*, 758 A.2d 1114, 1121 (Md. Ct. Spec. App. 2000).  Accordingly, the Court will dismiss Count III of the amended complaint.

2. Retaliation and Discrimination

APS argues that it is entitled to summary judgment on Romeo's remaining claims because she has failed to establish a prima facie case of discrimination or retaliation, and has not rebutted APS's legitimate, non-discriminatory reasons for firing her.  Mem. in Supp. of Mot. to Dismiss 10-15.

To survive an employer's motion for summary judgment, a plaintiff must show direct evidence of a Title VII violation, or establish a prima facie case that raises an inference of illegal

conduct.[12]  If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, lawful reason for its actions.[13]  If the defendant does so, the plaintiff must "establish[] that the employer's proffered explanation is pretext."[14]

a. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show that (1) she "engaged in a protected activity, such as filing a complaint with the EEOC," (2) her employer acted adversely against her, and (3) "the protected activity was causally connected to the employer's adverse action." *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (internal quotation marks omitted).

APS argues that Romeo has not shown that she engaged in a protected activity before her termination, or a causal link between protected activity and her termination.  Mem. in Supp. of Mot. to Dismiss 9-10.

---

[12] *See Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010); *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).

[13] *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 407 (4th Cir. 2005).

[14] *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (internal citation and quotation marks omitted).

i.   Protected Activity

APS contends that neither Romeo's February 2009 email nor her March 2009 fax to Wojcik was protected activity because neither alleged unlawful discrimination.  Mem. in Supp. of Mot. to Dismiss 9-10.  APS argues that Romeo did not complain about unlawful discrimination until after her termination and, thus, cannot establish retaliation.  *Id.*

Romeo counters that the March 2009 complaint was protected activity because it alleged that Cuomo had discriminated against her because "[she] [is] a woman or because [she] [is] a black woman."  ECF No. 13 at 7.

"Title VII protects the right of employees to . . . . complain to their superiors about suspected violations of [the statute]."  *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003).  Although Title VII does not protect general complaints of unfair treatment,[15] "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct."[16]

---

[15] *See Harris v. Md. House of Corr.*, 209 F. Supp. 2d 565, 570 (D. Md. 2002) (plaintiff did not engage in protected activity when she "merely complained of the unfair manner in which her superiors had treated her").

[16] *Burgess v. Bowen*, Case No. 10-2081, 2012 WL 517190, at *9 (4th Cir. Feb. 17, 2012).  *See also Settle v. Balt. Cnty.*, 34 F. Supp. 2d 969, 1007 (D. Md. 1999) (plaintiff engaged in protected

14

APS should have understood Romeo's complaint to include allegations of race and gender discrimination.  Romeo asserted that Cuomo had a "strong animosity towards [her]," because she "[is] a woman or because [she] [is] a black woman."  ECF No. 13, Ex. H at 3.  She further alleged that she had been transferred so that a man--receiving a higher salary--could take her job, and that Cuomo had "ma[de] it painfully clear every single day that he [didn't] like [her] and perhaps the sight of [her] disgust[ed] him."  *Id*. at 2-3.  Accordingly, Romeo has presented evidence that she engaged in a protected activity before her termination.

                    ii.   Causal Link

APS also argues that Romeo has failed to show a causal link between a protected activity and her termination.  Mem. in Supp. of Mot. to Dismiss 10.  APS contends that Romeo's "performance . . . and communication issues" started before she filed her internal complaint, so she cannot "establish that her performance problems and ultimate termination were causally connected to the . . . complaint."  ECF No. 15 at 6.

Romeo counters that "[t]he fact that she was fired less [than] two months after filing her internal complaint establishes the causal connection necessary to make the prima

activity "when he expressed his concerns of race discrimination at a meeting with his supervisors").

facie case for retaliation."  ECF No. 13 at 9.

Although "[a] prima facie showing of causation requires little proof,"[17] the plaintiff must show that it is more likely than not that her employer took the adverse employment action in retaliation for her protected activity.[18]  "[A] causal connection for purposes of demonstrating a prima facie case exists where the employer takes adverse employment action against the employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004).

The parties have presented conflicting evidence about why Romeo was fired.  APS relies on Romeo's termination letter and performance evaluations that show that she had been told to improve her performance on certain tasks but had made only slight improvement in 2009.  *See* ECF No. 13, Ex. E, F; ECF No. 11, Ex. 21.  APS also relies on emails suggesting that Romeo's accounts had been "short paid," she had failed to collect payments from a client for five months, and she had "overstated" accruals.  *See* ECF No. 11, Ex. 17, 19.  Romeo relies on evidence

---

[17] *Dewa v. Wash. Suburban Sanitary Comm'n*, 11 F. App'x 352, 364 (4th Cir. 2001).

[18] *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (plaintiff must establish a prima facie case by a preponderance of the evidence); *N.L.R.B. v. B.A. Mullican Lumber & Mfg. Co.*, 535 F.3d 271, 281 (4th Cir. 2008) (describing preponderance as requiring proof that something is "more likely than not" true).

that her termination came less than two months after she complained to Wojcik--suggesting that Romeo was fired in retaliation for her complaint.[19]

Because causation requires "little proof," *see Dewa*, 11 F. App'x at 364, the Court will assume that the short interval between Romeo's complaint and her termination establishes the requisite causal link.

   iii. Rebutting Lawful Reasons for Termination

Romeo's prima facie case of retaliation does not end the Court's inquiry. "[T]he prima facie case . . . is never by itself sufficient to permit a plaintiff to escape an adverse summary judgment ruling except in the rare instance when an employer is silent in the face of the presumption it raises." *Diamond*, 416 F.3d at 318. If APS presents a legitimate, non-retaliatory reason for firing Romeo, Romeo must "establish[] that [APS's] proffered explanation is pretext." *Navy Fed. Credit Union*, 424 F.3d at 407.

APS has presented evidence that it terminated Romeo for legitimate, non-retaliatory reasons. In Romeo's termination letter, Cuomo asserted that she had "consistently looked to others to provide answers to business questions," written off an

---

[19] *See, e.g., Kline v. Certainteed Corp.*, 205 F. Supp. 2d 468, 474-75 (D. Md. 2002) (plaintiff established a prima facie case of retaliation under Title VII because she had been terminated within two months of filing EEOC charges).

outstanding balance contrary to his instructions, overstated revenue, and taken almost four weeks to accomplish a project that should have taken three days. ECF No. 11, Ex. 21 at 1-3. Cuomo further asserted that other employees had "question[ed] [her] knowledge and accounting skills." *Id.* at 1.

APS has also submitted copies of emails in which Cuomo questioned Romeo about an account being "short paid," "missing cash," a "$1041 short payment" in an account, "overstated" accruals, and APS's failure to collect payments from a client for five months. ECF No. 11, Ex. 17 at 4, 6, 12-13, Ex. 19 at 2, 8. This evidence supports APS's contention that it had legitimate reasons for firing Romeo. *See* Mem. in Supp. of Mot. to Dismiss 14.

Because APS has articulated lawful, non-retaliatory reasons for firing her, Romeo must establish that APS's proffered explanation is pretext.[20] A "plaintiff can prove pretext by showing that the [defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of retaliation." *Price*, 380 F.3d at 212 (internal quotation marks omitted). A plaintiff is entitled to a trial on the merits only if "she establishes a factual record permitting a reasonable finder of fact to conclude that it is

---

[20] *See Hoyle*, 650 F.3d at 337; *Darvishian v. Geren*, 404 F. App'x 822, 828 (4th Cir. 2010).

more likely than not that the adverse employment action was the product of . . . retaliation." *Darvishian*, 404 F. App'x at 828.

Romeo has not carried this burden. She has "not demonstrated such weaknesses, implausibilities, or inconsistencies in [APS's] proferred reasons for [her] removal that a reasonable fact-finder could find those reasons unworthy of credence."[21] Nor has she offered "other forms of circumstantial evidence sufficiently probative of retaliation." *Price*, 380 F.3d at 212. Although she argues that her "positive performance reviews" undermine APS's "contention that there were issues with [her] performance," *see* ECF No. 13 at 13, she has presented no evidence to contradict the many deficiencies cited in those evaluations.[22] These serious criticisms were made before her complaints and, thus, were not manufactured as a pretext for her dismissal.[23]

---

[21] *Darvishian*, 404 F. App'x at 831 (internal quotation marks omitted). *See also Alvarado v. Bd. of Trs. of Montgomery Comty. Coll.*, 928 F.2d 118, 122-23 (4th Cir. 1991) (plaintiff showed pretext by showing that employer had offered multiple, inconsistent justifications for its adverse employment action).

[22] *See also Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008) ("Workers are shielded from retaliation on account of their assertion of rights protected under Title VII. But a complaining worker is not thereby insulated from the consequences of . . . poor performance.").

[23] *See Jyachosky v. Winter*, 343 F. App'x 871, 876 (4th Cir. 2009) (per curiam) (although plaintiff could "point to positive performance reviews," contemporaneous documents indicating "substantial problems with her supervisory role" showed that

Further, Romeo conceded in her March 2009 complaint to Wojcik that Cuomo had told her that she was "the only one who [felt] overwhelmed in the department and not open to take on more work," "[e]xecutives need[ed] all these analytics and [she] [was] not delivering," and "he [was] now forced to jump in and do [her] job." ECF No. 13, Ex. H at 4-6.

Romeo also contends that her termination just two months after she complained is "strongly suggestive of retaliation." ECF No. 13 at 13.  Although such a short interval may have raised a presumption of retaliation, that presumption "drop[ped] out of the picture" when APS articulated legitimate, non-retaliatory reasons for firing her.[24]  "[Romeo's] assertions of [retaliation] in and of themselves are simply insufficient to counter" those reasons.[25]

Because a reasonable jury could not find that Romeo

---

"these problems were not manufactured after her dismissal to serve as a pretext").

[24] *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).  *Accord Navy Fed. Credit Union*, 424 F.3d at 407.

[25] *See Dugan v. Albemarle Cnty. Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002).  *See also Larota-Florez v. Goldman Sachs Mortg. Co.*, 719 F. Supp. 2d 636, 638 (E.D. Va. 2010) ("Though the burden of proof rests initially with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the non-moving party must produce specific facts showing that there is a genuine issue for trial, rather than resting upon the bald assertions of h[er] pleadings.") (internal quotation marks omitted).

probably was fired for retaliatory purposes, *see Darvishian*, 404 F. App'x at 828, the Court will grant APS summary judgment on Count II (retaliation).

### b. Discrimination

To establish a prima facie case of discrimination, the plaintiff must show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *See Coleman*, 626 F.3d at 190.

### i.   Gender Discrimination

Romeo alleges disparate treatment and harassment[26] on the basis of her gender because she "was subjected to tasks which were not expected of her male counterparts," and once "was asked to lift heavy boxes as her male, Caucasian counterparts . . . looked on and ridiculed her."  Am. Compl. ¶ 15, 36-37; ECF No. 13 at 10.  She argues that her "change in status to Accountant III left her . . . overpaid," "overqualified," and "vulnerable .

---

[26] Although Count IV (gender discrimination) refers only to disparate treatment, the amended complaint asserts generally that Romeo "has endured harassment by immediate supervisors," *see* Am. Compl. ¶ 15, and Romeo argues in her opposition to the motion for summary judgment that she has alleged and submitted evidence of disparate treatment and harassment, *see* ECF No. 13 at 11.  "To establish a Title VII claim for sexual harassment in the workplace, a female plaintiff must prove that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003).

. . to be relieved at a future date" because it "was a lower entry position[] [that] chang[ed] her level of responsibility and prevent[ed] her from being positioned for growth at the company." ECF No. 13 at 10. She further asserts that Bishop was "similarly situated" and hired as an Accountant III, but was paid more money and promoted shortly after Romeo was fired. *Id.*

APS argues that Romeo cannot establish a prima facie case of gender discrimination because her "mere change in title" did not constitute an adverse employment action, *see* ECF No. 15 at 11, and being asked to lift boxes did not "affect[] the terms and conditions of her employment," Mem. in Supp. of Mot. to Dismiss 11. APS also contends that Bishop and Romeo were not similarly situated because Bishop had a master's degree and significantly more experience than Romeo. ECF No. 15 at 9.

"An adverse action is one that constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibili- ties, or a decision causing a significant change in benefits."[27]

---

[27] *Hoyle*, 650 F.3d at 337 (internal quotation marks omitted). *Accord Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) ("Disparate treatment theory . . . has consistently focused on . . . whether there has been discrimination in . . . ultimate employment decisions such as hiring, granting leave, dis- charging, promoting, and compensating."); *Finnegan v. Dep't of Pub. Safety & Corr. Servs.*, 184 F. Supp. 2d 457, 461 (D. Md. 2002) ("An employer's act must alter the terms, conditions, or benefits of employment to qualify as an adverse employment action.").

"[R]eassignment to a new position commensurate with one's salary level" generally is not "an adverse employment action even if the new job does cause some modest stress."[28]  A "new job assignment [that] is less appealing to the employee" is not an adverse action "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion." *James*, 368 F.3d at 376.  Moreover, "isolated incidents or random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." *Houck v. Va. Polytechnic Inst. & State Univ.*, 10 F.3d 204, 206-07 (4th Cir. 1993).

Romeo has failed to establish a prima facie case of gender discrimination.  An "isolated incident" of lifting heavy boxes while her male co-workers laughed is not actionable gender discrimination under Title VII. *See Houck*, 10 F.3d at 206-07.  Romeo has also failed to show that her classification as an Accountant III was an adverse employment action.  Although she asserts that the change "left her vulnerable and positioned to be relieved at a future date," *see* ECF No. 13, her only evidence of this is her March 2009 complaint to Wojcik, *see id.*, *citing*

---

[28] *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004), *cert. denied*, 543 U.S. 959 (2004).

Ex. H.  Romeo's mere "speculations about the impact of [her]
[reclassification] on [her] opportunities for professional
development . . . are not sufficient to survive summary
judgment." *James*, 368 F.3d at 373.  Finally, Romeo has not
shown that she and Bishop were similarly situated.  "The
appropriate factors to consider in a discriminatory compensation
claim include whether the Plaintiff and those who she claims are
similarly situated had the same or substantially similar
experience, education, duties, and qualifications."[29]  APS
presented evidence that Romeo had about half as many years of
experience as Bishop, and lacked Bishop's master's degree.  *See*
ECF No. 11, Ex. 1, 9.  Given these differences, one cannot
reasonably infer that Bishop was paid more solely because he was
a man.[30]

----

[29] *Williams v. Carolinas Healthcare Sys.*, Case No 3:10-cv-232-
GCM, 2011 WL 1131087, at *3 (W.D.N.C. Mar. 25, 2011).  *Accord
Itrube v. Wandel & Golterman Techs., Inc.*, 23 F.3d 401 (table),
1994 WL 118103, at *4 (4th Cir. 1994) (per curiam) (affirming
district court's finding that plaintiff had been paid less
because his co-worker had more experience and a better job
performance record).

[30] Had the Court accepted that Bishop and Romeo were similarly
situated because they had the same title, APS would still be
entitled to summary judgment.  Romeo has failed to rebut APS's
legitimate, non-discriminatory explanation for the pay dispari-
ty, i.e. that Bishop had more experience and education.  *See
Evans*, 80 F.3d at 960 ("relative employee qualifications are
widely recognized as valid, non-discriminatory bases for any
adverse employment decision"; a plaintiff's "unsubstantiated
allegations and bald assertions concerning her own qualifica-
tions . . . fail to . . . show discrimination").

24

Because Romeo has failed to present a prima facie case of gender discrimination,[31] the Court will grant APS summary judgment on Count IV (gender discrimination).

i.   Race Discrimination

Romeo argues that she was the victim of racial discrimination and harassment[32] because she "was repeatedly subjected to racially charged comments by [Cuomo]," including "disparaging remarks about African Americans and HIV/AIDS," and his statement that "the country is worse off with an African American [p]resident." ECF No. 13 at 11.  She also contends that she "was not given the warnings that were customarily given to Caucasian employees before her termination." *Id.* at 12.

APS argues that Romeo has failed to present a prima facie case of race discrimination because she has not provided any details of Caucasian employees who were given warnings before

---

[31] Romeo has also failed to establish sexual harassment because she has failed to show, *inter alia*, evidence of any offensive conduct that was based on her gender and "sufficiently severe or pervasive to alter the conditions of her employment." *See* *Ocheltree*, 335 F.3d at 331.

[32] Although Count I (racial discrimination) describes only disparate treatment, the amended complaint refers generally to "harassment by immediate supervisors," *see* Am. Compl. 15, and Romeo argues in her opposition to the motion for summary judgment that she was the victim of racial harassment, *see* ECF No. 13 at 11.  To prevail on a racial harassment claim, a plaintiff must show that the offending conduct was (1) unwelcome, (2) because of her race, (3) "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment," and (4) "imputable to her employer." *Bonds*, 629 F.3d at 385.

termination, and Cuomo's comments were not racial harassment. *Id.* at 11-13.

Romeo has failed to establish a prima facie case of discrimination on the issue of pre-termination warnings.  She has neither identified a Caucasian employee who received such a warning, nor provided details of any such warning.  To defeat summary judgment, Romeo must identify a genuine issue of material fact, not simply restate her "conclusory allegations" that Caucasian workers were treated differently.  *See Erwin v. United States*, 591 F.3d 313, 319 (4th Cir. 2010).

Romeo has also failed to show that Cuomo's remarks were "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment."  *See Bonds*, 629 F.3d at 385.  "Title VII does not guarantee a happy workplace, only one free from unlawful discrimination."[33]  Thus, "[a]n insulting or demeaning remark does not create a federal cause of action for . . . harassment merely because the 'victim' of the remark happens to belong to a class protected by Title VII."  *Hartsell*, 123 F.3d at 772.  The statute "prohibits only harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive."[34]

---

[33] *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997).

[34] *Hartsell*, 123 F.3d at 773.  *Accord Faragher v. City of Boca*

26

To determine if the conduct was objectively severe, the
Court examines "the totality of the circumstances, including the
frequency of the discriminatory conduct; its severity; whether
it is physically threatening or humiliating, or a mere[ly]
offensive utterance; and whether it unreasonably interferes with
an employee's work performance." *Lauture v. St. Agnes Hosp.*,
429 F. App'x 300, 306-07 (4th Cir. 2011) (internal quotation
marks omitted).  "[T]he abusive conduct must be sufficiently
pervasive so as to become diffuse throughout every part of the
work environment in which [the] plaintiff functioned."[35]
"[S]imple teasing, offhand comments, and isolated incidents
(unless extremely serious) will not amount to discriminatory
changes in the terms and conditions of employment."[36]

---

*Raton*, 524 U.S. 775, 788 (1998) (the "standards for judging
hostility are sufficiently demanding to ensure that Title VII
does not become a 'general civility code'"); *Beall v. Abbott
Labs.*, 130 F.3d 614, 620-21 (4th Cir. 1997) ("Title VII simply
does not guarantee freedom from insensitive remarks that do not
create an objectively abusive work environment."), *abrogated on
other grounds, as recognized by Gilliam v. S.C. Dep't of
Juvenile Justice*, 474 F.3d 134 (4th Cir. 2007).

[35] *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 776-77
(D. Md. 2010) (internal citations and quotation marks omitted).

[36] *Faragher*, 524 U.S. at 788 (internal citation and quotation
marks omitted).  *Compare EEOC v. Cent. Wholesalers, Inc.*, 573
F.3d 167, 176-78 (4th Cir. 2009) (reasonable jury could find
that race-based harassment was objectively severe or pervasive
when co-workers used the word "nigger" "pretty much every day,"
called the plaintiff a "black stupid bitch," and kept dolls in
their offices hung by nooses tied around their necks), *and
Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184-85 (4th Cir.

Romeo has failed to show that Cuomo's remarks were "so severe or pervasive as to render the workplace objectively hostile or abusive." *See Hartsell*, 123 F.3d at 773.  None of the alleged remarks expressly referred to race, or used "an unambiguously racial epithet." *Spriggs*, 242 F.3d at 185.  Nor has Romeo presented evidence that the statements--however offensive--were more than isolated or occasional remarks.[37] "Even if [Cuomo's] comments could be interpreted as racial slurs, occasional or sporadic instances of the use of racial . . . slurs in and of themselves do not constitute acts of racial discrimination."[38]

---

2001) (plaintiff established racially abusive environment by showing that his supervisor had referred to him and other African Americans as "nigger[s]" and "monkey[s]" "on a 'continuous daily' basis"), *with EEOC v. Xerxes Corp.*, 639 F.3d 658, 667, 676-77 (4th Cir. 2011) (plaintiff failed to establish objectively pervasive race-based harassment when co-worker "used the N word a bunch of different times" but plaintiff provided no further details), *and Orenge v. Veneman*, 218 F. Supp. 2d 758, 761 (D. Md. 2002) (repeated comments--over seven years--that "whites will never trust blacks again" after the O.J. Simpson murder trial, "blacks are trying to get a free ride," and "you guys don't pull your weight" did not establish objectively severe or pervasive racial harassment).

[37] Although Romeo asserted in an attachment to the amended complaint that Cuomo "constantly made unprofessional statements," *see* Am. Compl., Ex. I at 3, she has presented no evidence that the remarks were frequent.

[38] *See Persaud v. Morgan State Univ.*, 34 F.3d 1066 (table), 1994 WL 446797, at *2 (4th Cir. 1994) (per curiam) (internal quotation marks omitted). *Accord Fisher v. Md. Dep't of Housing and Cmty. Dev.*, 32 F. Supp. 2d 257, 263 (D. Md. 1998) (plaintiff did not establish an objectively abusive environment with

Because Romeo has not established a prima facie case of race discrimination or harassment, the Court will grant APS summary judgment on Count I (race discrimination).

III. Conclusion

For the reasons stated above, the Court will grant APS's motion to dismiss and for summary judgment.

__5/15/12__
Date

William D. Quarles, Jr.
United States District Judge

---

"wholly unsubstantiated" allegations of "racially insensitive comments" that were "isolated in nature").